IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


EAST PORTLAND IMAGING                                    CV. 05-465-KI
CENTER, P.C., et al.,

                   Plaintiffs,                          OPINION & ORDER

    v.

PROVIDENCE HEALTH SYSTEM -
OREGON, et al.,
               Defendants.

KING, Judge

      Plaintiffs East Portland Imaging Center, P.C., doing business as EPIC Imaging-East

("EPIC"); Body Imaging, P.C., doing business as Body Imaging Radiology; and Women's Imaging,

P.C., doing business as Pacific Breast Center, operate outpatient diagnostic imaging services.

Defendants Providence Health System–Oregon ("Health System"), Providence Health Plan (a health

care services contractor, the "Health Plan" or "PHP"), and Providence Plan Partners (a preferred

provider organization, or "PPO"), (collectively, defendants or "Providence") operate an extensive

network of hospitals and physicians that provide both inpatient and outpatient services, including

diagnostic imaging.  Providence informed plaintiffs that it would terminate all agreements for

Page 1 - OPINION AND ORDER

medical services effective May 1, 2005, intending to consolidate the services in Portland through defendants' facilities.  Plaintiffs' Second Amended Complaint alleges a single claim against defendants under the Sherman Act, 15 U.S.C. § 2, for attempted monopolization.  Before the Court are Defendants' Motion to Exclude Plaintiffs' Expert Testimony (#182) and Defendants' Motion for Summary Judgment (#168).  For the reasons below, I admit plaintiffs' expert testimony but grant defendants' motion for summary judgment.

**FACTS**

Outpatient diagnostic imaging services include basic radiology or x-ray, ultrasound, mammography, computerized tomography ("CT"), magnetic resonance imaging ("MRI"), and nuclear imaging.  The parties agree that there are four relevant diagnostic imaging product markets at issue:  mammography, CT, MRI, and nuclear imaging.[1]

The Health System and the radiologists who provide services at Providence Portland Medical Center formed Center for Medical Imaging, LLC ("CMI") as a 50/50 limited liability company.  The Health System and the radiologists who provide services at Providence St. Vincent Medical Center formed Portland Medical Imaging, LLC ("PMI") as a 50/50 limited liability company.  PMI and CMI opened facilities in Portland for outpatient diagnostic imaging in 2005.

The Health Plan and the PPO contract with a limited number of providers, including both affiliated providers and community physicians, to provide services at discounted rates.  Neither the Health Plan nor the PPO has ever included all qualified providers of outpatient imaging

---

[1]  Providence has agreed to this fact, and some others, only for purposes of this motion and may take a different position at trial.

services, or even most of them, on their provider panels. The Health Plan and the PPO used to contract with plaintiffs' radiologists to provide services but those contracts have all been terminated. The termination of plaintiffs from the Health Plan and PPO network caused them to lose in excess of 20% of their business.

Besides plaintiffs and the Health System, there are other providers of outpatient diagnostic imaging services in the area, including hospitals, imaging centers, and some physician offices. Plaintiffs are contracted providers for many health plans in the Portland area other than the Health Plan and Kaiser. Most enrollees in the Health Plan and the PPO can go to non-network providers and still receive a health care benefit but must pay a greater out-of-pocket cost.

The PPO panel is rented to over 100 insurance providers. The contract termination also excluded plaintiffs from these nonparty insurance providers.

Plaintiffs' expert, Dr. Whitelaw, has seen no evidence that prices did or will increase in any market as a result of defendants' conduct. Whitelaw Dep. at 262, 267. He is also unaware of any evidence that the number of diagnostic imaging providers decreased, or is likely to decrease, as a result of defendants' conduct. Whitelaw Dep. at 333-334.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried.

Page 3 - OPINION AND ORDER

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the

evidence is viewed in the light most favorable to the nonmoving party.  Universal Health

Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

**DISCUSSION**

I.    Motion to Strike

Defendants move to exclude the expert report and testimony of plaintiffs' economic

expert, Dr. Ed Whitelaw, on the grounds that Dr. Whitelaw's conclusions:  (1) are inconsistent

with applicable law and with the undisputed factual record; (2) are not based on expert

knowledge, training, and experience; (3) rest on unsupported or erroneous assumptions; and (4)

are not helpful to the jury.

Plaintiffs note generally that the definition of relevant market for antitrust purposes is

fundamentally a jury question.  Plaintiffs contend that Dr. Whitelaw and the defense economist,

Dr. Wu, both offer reasoned opinions based on differing views of the fundamental economics to

reach different conclusions.  Rather than exclude either expert, plaintiffs argue that both

approaches are worthy of a presentation to a jury for a decision.

The subject of expert testimony must be scientific knowledge which will assist the trier of

fact to understand or determine a fact in issue.  Daubert v. Merrell Dow Pharmaceuticals, Inc.,

509 U.S. 579, 592 (1993).  The focus of the inquiry is on the methodology, not on the

conclusions.  Id. at 595.  Factors to be considered when determining if the testimony is reliable

scientific knowledge are whether the theory or technique is generally accepted in the relevant

scientific community, whether it has been subjected to peer review and publication, whether it

can be and has been tested, whether standards exist to control the technique's operations, and

whether the known or potential rate of error is acceptable.  Id. at 593-94.  The inquiry, however, is a flexible one.  Other relevant factors may be considered and the factors listed in Daubert may not be reasonable measures of the reliability of expert testimony in a particular case.  Id. at 594; Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 147-153, 119 S. Ct. 1167 (1999).  The court's "gatekeeping" obligation applies to technical and other specialized knowledge as well as scientific knowledge.  Kumho, 526 U.S. at 147.

There is no question that Dr. Whitelaw is a recognized expert in the field.  I am not convinced that his methodology is unsound.  Any case with experts has them disputing the conclusions that can be drawn from the relevant data.  I will consider defendants' arguments concerning Dr. Whitelaw's opinions and definition of the market when I analyze whether his testimony is legally sufficient to create a question of material fact on plaintiffs' attempted monopolization claim.  "An expert witness may be qualified to testify even though the expert's conclusions are legally incorrect.  See General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997) (district courts may reject expert testimony that is based on sound methodology when "there is simply too great an analytical gap between the data and the opinion proffered")."  Rebel Oil Co., Inc. v. Atlantic Richfield Co. ("Rebel II"), 146 F.3d 1088, 1097 (9th Cir.), cert. denied, 525 U.S. 1017 (1998).

II.     Definition of Market

        A.      Exclusion of Clark County

Dr. Whitelaw's report defines the relevant geographic market to include Multnomah, Washington, and Clackamas Counties.  He based his conclusion on the distribution of diagnostic imaging patients, defendants' strategic planning documents, relevant economic literature, and

reports and guidelines from the Federal Trade Commission and Department of Justice.  Whitelaw
Report at 8-12.

Defining the relevant market requires identification of both the product at issue and the
geographic market for the product.  Bailey v. Allgas, Inc., 284 F.3d 1237, 1246 (11th Cir. 2002).
A "market" is the "group of sellers or producers who have the actual or potential ability to
deprive each other of significant levels of business."  Rebel Oil Company, Inc. v. Atlantic
Richfield Co., 51 F.3d 1421, 1434 (9th Cir.) (internal quotation omitted), cert. denied, 516 U.S.
987 (1995).  If consumers view the products as substitutes, the products are part of the same
market.  Id. at 1435.  A geographic market cannot be drawn "simply to coincide with the market
area of a specific company."  Bailey, 284 F.3d at 1249; Morgan, Strand, Wheeler & Biggs v.
Radiology, Ltd., 924 F.2d 1484, 1490 (9th Cir. 1991).  The definition of the relevant market is a
factual inquiry for the jury, although summary judgment is not necessarily precluded.  Rebel, 51
F.3d at 1435.

> In the context of antitrust law, if there are undisputed facts about the structure of
> the market that render the inference economically unreasonable, the expert
> opinion is insufficient to support a jury verdict. . . . The inquiry is whether the
> inference to be drawn from the expert's opinion is reasonable given the
> substantive law which is the foundation for the claim or defense."

Id. at 1436 (internal quotation omitted).

Defendants contend that the exclusion of Clark County from the market is the classic
error of confusing the litigants' target markets with the broader dimensions of an economically
significant market that is protected from significant outside competition.  They argue that the
issue is where significant numbers of patients could practically turn for alternatives in response
to a noncompetitive price increase or restriction of output.  Defendants calculate that the

Page 6 - OPINION AND ORDER

exclusion of Clark County from the market leads to a significant overstatement of defendants' market shares.

Defendants note the following facts. EPIC's marketing director James Kern identified Clark County providers as competitive threats, specifically the outpatient facility at Southwest Washington Medical Center in Vancouver. A strategic plan for EPIC, drafted by Bill Dunlap, EPIC's general manager, shows that EPIC competes for patients in all four counties, including Clark County. Currently, more than 10% of EPIC's revenues come from patients living in Vancouver and surrounding portions of Clark County. Dr. Whitelaw did not have the Kern marketing analysis or the Dunlap strategic plan when he formed his opinion. Whitelaw Dep. 166.

Plaintiffs discount the importance of the Kern marketing analysis and the Dunlap strategic plan. The Kern analysis was a school project written by Kern while obtaining his MBA when working for EPIC. The Dunlap plan was written when Dunlap was a student while also working for EPIC. No other EPIC employee had any knowledge of the Kern document until it was provided in discovery in this litigation. Dr. Warnock, owner and medical director of EPIC East, had rejected the approach in the Dunlap document. Neither document was adopted by EPIC. Kern Decl. ¶¶ 2-4; Second Whitelaw Decl. ¶ 28; Warnock Depo. at 39.

I agree with plaintiffs that student projects that were not adopted by plaintiffs or their founders are entitled to little, if any, weight. The drafters of the documents are not offered as experts and plaintiffs did not rely on the information.

Thirty-two percent of Clark County workers work in the tri-county area and many of them choose to obtain medical care in that area rather than in Clark County. Dr. Whitelaw did not have information on how many patients in the tri-county area currently go outside those counties for diagnostic imaging services, or how many would do so in response to a price rise to a noncompetitive level. Whitelaw Dep. at 168. Dr. Whitelaw's analysis showed that patients living in the tri-county area account for 82% of the CT, 88% of the mammography, 82% of the MRI, and 75% of the nuclear imaging charges. The remaining patients are from outside the tri-county area but there is no breakdown on how many are from Clark County and how many are from other parts of Oregon or Washington.

Concerning the commuters from Clark County, Dr. Whitelaw concluded that a portion of the commuters likely choose to receive diagnostic imaging services close to where they work to economize on travel costs. Second Whitelaw Decl. ¶ 25; Whitelaw Report at 11-12.

Defendants also note that Dr. Whitelaw chose to ignore other statements which include Clark County in the relevant market. The PHP Strategic Business Plan 2004-2007 states that the PPO offers network access to eligibles in Oregon and Southwest Washington and that by 2001, the Health Plan enjoyed a strong market presence in Oregon and SW Washington. Kelley Aff. Ex. 14 at 9, 16.

Plaintiffs note that Dr. Whitelaw considered defendants' strategic-planning documents concerning the competition for its two new joint ventures, PMI and CMI. PMI's professional services agreement states that PMI will compete only within Portland's Urban Growth Boundary, which is smaller than the entire tri-county area. The agreement's noncompetition provisions prevent competition within a small subset of the tri-county area, surrounding some of the Health

System facilities. Kelley Aff. Ex. 50 § 2.3 at 2, § 8.7(b)(I) at 4. Dr. Whitelaw also considered

the marketing and competitive analysis for CMI, which limits the geographic market for its

competition to mid-Washington County based on a study by AGI Healthcare Group. Whitelaw

Decl. ¶ 24; Second Burger Decl. Ex. 3 at 2. Plaintiffs contend that it is appropriate for

Dr. Whitelaw to limit the markets to the tri-county area because that is where PMI and CMI

limited their market.

This last argument does not comport with the law as stated in Bailey and Morgan, Strand.

Although Dr. Whitelaw did rely heavily on the geographic area in which the new joint ventures

intended to compete, he also considered commuter patterns and travel costs. Accordingly, I

conclude there is some evidence from which a reasonable trier of fact could find that the market

does not include Clark County.

B.      Exclusion of Kaiser Permanente ("Kaiser") Facilities

Dr. Whitelaw excluded from the market procedures performed at Kaiser facilities because

"Kaiser operates a closed system that prevents patients from moving into or out of the system at

will. For this reason Kaiser DI [diagnostic imaging] facilities are not practical substitutes for the

other DI facilities in our analysis." Whitelaw Report at 13.

Defendants argue that the exclusion of Kaiser procedures overstates defendants' market

shares. Defendants contend that Kaiser procedures cannot be excluded from the relevant market

on the basis that they are captive sales. They note that Kaiser, the Health Plan, and other payors

are in regular competition with each other because in most cases, individuals can readily switch

from one health plan to another, typically on an annual basis. Similarly, employers can change

the plans that they offer. Defendants argue that the situation with Kaiser is distinguishable from

cases holding that output locked up by long-term contracts can be excluded from consideration in determining market shares.

Dr. Whitelaw notes that non-Kaiser patients cannot access diagnostic imaging services at a Kaiser facility except under emergency conditions. Likewise, Kaiser insurance will not pay for nonemergency diagnostic imaging procedures administered at non-Kaiser facilities. Dr. Whitelaw disputes defendants' contention that because patients can switch between health plans on an annual basis, Kaiser should be included in the market. He relies on economic literature which states that one of the most important determinants of consumer choice regarding health insurance is continued access to the person's primary care physician. A switch into or out of Kaiser typically would sever this relationship. Second Whitelaw Decl. ¶¶ 55-57.

Defendants rely on <u>California v. Sutter Health System</u>, 84 F. Supp. 2d 1057, 1068, <u>aff'd</u>, 217 F.3d 846 (9th Cir. 2000), for its holding that a Kaiser hospital was part of the relevant product market. Procedurally, however, the court was acting as the fact finder in ruling on a motion for a preliminary injunction. In an amended opinion, the parties had reached an agreement adopted by the court that for purposes of the case, Kaiser should be included in the market because it provided a viable substitute for services offered at other hospitals. <u>California v. Sutter Health System</u>, 130 F. Supp. 2d 1109, 1119-20 (2001).

I also distinguish <u>Morgan, Strand</u>, which concluded that there was insufficient evidence for a jury to conclude that University and osteopathic radiologists did not compete with private medical radiologists. The record contained evidence that osteopathic physicians did not order interpretations from private medical radiologists but no evidence on whether private medical physicians referred to osteopathic radiologists. Likewise, there was evidence that University

radiologists receive referrals only from University physicians, but not on whether University physicians also refer to radiologists outside the University.  Morgan, Strand, 924 F.2d at 1489. Here, Dr. Whitelaw provided evidence on referral patterns both going into and coming from Kaiser.

Because the ability to move between health plans is usually constrained to a particular time of the year rather than at the choice of the consumer, and the evidence concerning a patient's loyalty to a primary care physician, there are factual issues on whether Kaiser is a reasonable substitute for diagnostic imaging services.  I conclude that a reasonable trier of fact could find that the market does not include Kaiser.

C.      Adequacy of Data for Computing Market Shares

First, defendants object to the fact that Dr. Whitelaw did not obtain data from all providers of the relevant diagnostic imaging services.  Defendants list 17 providers in the tri-county area which they believe should have been included.  Second Jackson Decl. ¶¶31-33. Without the data from the additional providers, defendants contend that Dr. Whitelaw should have extrapolated his data to the market as a whole.  His report does not offer a basis for an extrapolation.

Plaintiffs argue that the 17 providers listed by defendants are either out of the relevant geographic market, have a single modality, are limited to individual physicians who self-refer, or supply few diagnostic imaging procedures.  According to Dr. Whitelaw, excluding them does not materially change the market shares for defendants by modality.  Second Whitelaw Decl. ¶ 38. Plaintiffs have raised a factual issue on whether it was reasonable to leave these additional providers out of the market when calculating market shares.

Second, defendants object to Dr. Whitelaw's reliance on charges for his estimate of market shares. Defendants characterize charges as list prices, which differ considerably from revenues because the revenues may be based on a negotiated discount or on what a payor decides to pay. Because the discounts are not uniform across providers, the use of undiscounted charges affects the market share percentages. Defendants contend that this bias is particularly bad against hospitals such as the Health System. Dr. Wu calculated that for every dollar of charges reported by hospitals in the data set, the hospitals received, on average, 46 to 52 cents in actual revenues while the physician clinics received, on average, 65 to 70 cents. Wu Decl. ¶¶ 3-4.

Plaintiffs contend that any measure of market share may be used that is reasonable and consistently applied. Although Dr. Whitelaw would have preferred data other than charges, he concluded that it is not possible or reasonable to use the number of procedures to assess market shares due to inconsistencies in how that data is reported. Dr. Whitelaw also disputes the accuracy of Dr. Wu's interpretation of the revenue versus charge ratio, as stated in the last paragraph. Dr. Whitelaw contends that this is actually the reimbursement ratio, which also includes revenues for associated services, such as pain management. Whitelaw Dep. at 180-183; Second Whitelaw Decl. ¶¶ 34-35, 52.

Defendants' arguments go towards the weight of Dr. Whitelaw's testimony but do not discredit it enough to discount the opinion entirely. I also note that there is a dispute about the correct interpretation of the data. The issue is one for the jury.

> D.   Assumptions about Patient Choice to Determine Market Share Increase

Dr. Whitelaw concludes that as a result of the alleged antitrust injury, defendants' share of diagnostic imaging in the non-Clark County, non-Kaiser market will rise by between 1.4% and

3.4%, depending on the modality.  Whitelaw Report at 17.  Dr. Whitelaw relies on the

assumption that all of plaintiffs' patients enrolled in the Health Plan and PPO will cease to use

plaintiffs' services and will take their business to defendants.  Dr. Whitelaw states that the

patients covered by the Health Plan have no alternative to Providence outpatient facilities for

diagnostic imaging services "without paying increased out-of-pocket expenses and expending

considerable amounts of time."  Whitelaw Report at 2.

Defendants contend that there is no evidentiary basis to support this assumption, which

does not rely on Dr. Whitelaw's training and experience as an economist.  Defendants argue that

patients can patronize members of the PPO panel other than defendants, can switch to health

plans offering a panel that includes plaintiffs, or can continue to use plaintiffs under the Health

Plan or PPO by paying a greater out-of-pocket fee.

Dr. Whitelaw was unaware how many people on the Health Plan or PPO go out of

network to obtain diagnostic imaging.  He also did not know how many providers in the Health

Plan or PPO were not Providence facilities.  Whitelaw Dep. at 212-14, 232.  Dr. Meunier was

aware of mammography patients who had been coming to Body Imaging for years and who were

electing to use out-of-plan benefits so they would not have to switch facilities.  Meunier Dep. at

317.

Dr. Whitelaw states, "Given the close proximity of the two new Providence joint ventures

to plaintiffs, it is most likely that the PHP and PPO patients who were going to EPIC and Body

Imaging will turn to the outpatient facilities at the nearby Providence hospitals or the new

joint-venture imaging centers."  Second Whitelaw Decl. ¶ 40.  Defendants contend that

Dr. Whitelaw is not qualified to give this opinion, particularly after acknowledging at his

Page 13 - OPINION AND ORDER

deposition that these patients had multiple choices available to them, other than facilities in which defendants have an interest, and that he had no basis for determining which facilities they would choose or in what proportion.

I agree with defendants that Dr. Whitelaw's basis for the assumption–the closeness of the facilities–is skimpy at best. He was unaware of how many non-Providence choices remained available under the Health Plan or the PPO. Dr. Whitelaw had no surveys of the patients, cites to no studies explaining how patients choose health care providers, and has no expertise in that field. There is also evidence that at least some patients remained at Body Imaging for mammography, even when required to pay additional out-of-network charges.

Balanced against this lack of evidence is the fact that Dr. Whitelaw used this assumption to calculate market share increases ranging from 1.4% and 3.4%, depending on the modality. Those increases are small even though they show the biggest possible increase to Providence. Although Dr. Whitelaw's assumption is not well supported, it is equally as unlikely that *none* of the patients would leave plaintiffs' facilities and switch to Providence. Thus, I am not persuaded that this unsupported assumption is significant enough to conclude that Dr. Whitelaw's entire opinion is unworthy of any credence.

    E.    <u>Assumptions about Future Market Share Increase</u>

Dr. Whitelaw calculates Providence's market share resulting from the termination to be 40.3% for CT, 36.9% for mammogram, 33.3% for MRI, and 43.0% for nuclear imaging. Second Whitelaw Decl. ¶ 43. Dr. Whitelaw states:

> Assuming Providence successfully implements its development plans for the PHS, the PHP, and the Ambulatory Services Strategy, Providence would increase its market share for DI services in the Portland market beyond what it

achieved by excluding the Plaintiffs from the PHP and the PPO product.  I find
substantial likelihood that Providence will achieve greater-than-50-percent market
shares in the near future for the relevant DI services at issue.

Whitelaw Report at 20.  He clarified this in a later declaration:

>    It is not feasible to calculate with precision the percentage increments by
> which Providence's market shares in the various DI modalities at issue here would
> increase with each addition to Providence's hospital, ambulatory services,
> physician services or insurance divisions.  Given Providence's resources and
> intentions, however, it is my opinion that much more likely than not, Providence
> will achieve its Vision 2000 growth goal of 20% by the end of 2007.  I have the
> same opinion of the likelihood Providence will implement significant portions of
> its long-term strategy.  Should it do so, it is my further opinion that there is a
> dangerous probability that Providence will capture a more-than-50% market share
> in the DI modalities of mammography, MRI, CT and nuclear imaging.  For
> emphasis and clarity, I will state explicitly what is partially implicit in what I have
> just opined.  I do not consider it necessary for Providence to make all the gains it
> projects in its planning documents for it to achieve monopolization of the four
> modalities at issue in this matter.  For example, the combination of a hospital and
> insurance plan acquisition likely would prove sufficient to place Providence in a
> monopoly position for DI services in the Portland area.

Second Whitelaw Decl. ¶ 51.  Dr. Whitelaw cites to several long range financial and strategic

plans written by the Health System and Health Plan which detail growth goals for 2004 through

2007.  Second Whitelaw Decl. ¶ 44-45 & n.12.  In his report, Dr. Whitelaw states his

understanding that Providence may purchase Tuality Hospital in Washington County and

Willamette Falls Hospital in Clackamas County and also build a hospital and outpatient facility

on 20 acres it owns in North Clackamas County.  Whitelaw Report at 17.

Defendants generally argue that Dr. Whitelaw's testimony is based on factual

assumptions that in some cases have been contradicted by indisputable record facts, and that he is

not qualified to make the predictions included in his report.  Defendants contend that

Dr. Whitelaw has no basis for his assumption that the Health System may purchase Tuality and

Page 15 - OPINION AND ORDER

Willamette Falls Hospitals.  Defendants contends that these purchases will not occur.  Whitelaw

Dep. at 221; Warnock Dep. at 86.  Providence also contends that it will not be purchasing

another health plan, even though this possibility was stated in a 2004 Providence document.  The

possible target, PacifiCare of Oregon, Inc., was acquired by United Healthcare.  The Health Plan

has not identified any other attractive acquisition opportunities.  Second Jackson Dec. ¶ 42.

Similarly, defendants contend that the evidence of Providence's future plans to build hospital and

outpatient facilities in Clackamas County, or of the referral patterns for diagnostic imaging from

the 225 new physicians Providence intended to add to its Health System, is insufficient to

support the growth conclusion.

        Defendants also argue that any growth on their part must be studied in relation to growth

on the part of their competition, but Dr. Whitelaw failed to do this.  Defendants note many areas

of expected growth by competitors with additional scanners being installed at several existing

facilities and Kaiser's plans to build a new hospital.  Kern Dep. at 63-64; Smith Dep. at 70.

Finally, defendants argue that Dr. Whitelaw is not qualified to give an opinion on the likelihood

of successful implementation of defendants' business plans.

        Plaintiffs contend that defendants plan to grow "explosively," as set forth in multiple

strategic plans, including one or two additional hospitals, two additional imaging centers,

acquisition of another health plan and capturing 50% of the new physicians entering practice in

the tri-county area each year.  Kelley Aff. Exs. 1-7.  Current growth includes major expansions at

two Providence hospital campuses and the pursuit of acquiring or building three additional

hospitals.  Plaintiffs argue that in western Washington County, defendants have targeted

acquiring Tuality Hospital or the construction of a new hospital, and in Clackamas County,

defendants are monitoring the opportunity to acquire Willamette Falls Hospital as well as land in Happy Valley for a new hospital and ambulatory services facilities.  Second Whitelaw Decl. ¶ 44-51.  Plaintiffs discount the deposition testimony of defendants' executives concerning the lack of finality of some of the planned growth.  Plaintiffs also note that defendants have the cash to carry out the growth strategy.

Providence put its intent to expand into many of its planning documents.  By its nature, an attempted monopoly claim tries to anticipate future events.  Cases have been based to some extent on the subjective statements of management concerning whether the company intends to enter a market.  See United States v. Falstaff Brewing Corp., 410 U.S. 526, 563-70, 93 S. Ct. 1096 (1973) (discussion of the use of subjective evidence of corporate intent in an action under Clayton Act to enjoin an acquisition).  Although some of the possible opportunities have vanished, Providence has not disavowed its stated intent to grow.  The planning documents are current documents.  It is for a jury to decide how much weight to give them when considering the dangerous probability of achieving monopoly power.

III.    Attempted Monopolization Claim

Plaintiffs allege an attempted monopolization claim against defendants for their conduct in opening CMI and PMI; terminating plaintiff's contracts with the Health Plan and PPO panel; and taking measures to encourage referrals within the Health System rather than to outside providers.

Section 2 of the Sherman Act makes it an offense for any person to "monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize any part of the trade or commerce among the several States."  15 U.S.C. § 2.  To establish a violation for attempted

monopolization, a plaintiff must prove (1) defendant has engaged in predatory or anticompetitive

conduct; (2) a specific intent to monopolize; (3) a dangerous probability of achieving monopoly

power; and (4) causal antitrust injury.  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456,

113 S. Ct. 884 (1993); Atlantic Richfield Co. v. USA Petroleum, Inc., 495 U.S. 328, 334, 110 S.

Ct. 1884 (1990); Rebel Oil Company, Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1433 (1995).

      A.    Predatory or Anticompetitive Conduct

An act is deemed anticompetitive under the Sherman Act "only when it harms both

allocative efficiency and raises the prices of goods above competitive levels or diminishes their

quality."  Rebel, 51 F.3d at 1433.  "Anticompetitive or predatory acts are those that tend to

exclude or restrict competition on some basis other than efficiency."  Confederated Tribes of

Siletz Indians of Oregon v. Weyerhaeuser Co., 411 F.3d 1030, 1041 (9th Cir. 2005) (internal

quotation omitted), petition for cert. filed (Sept. 23, 2005) (No. 05-381).

Providence accepts the following:  (1) its prior authorization agent between February and

June 2005 put a protocol in place to suggest Providence facilities to any physician wanting

authorization who had not already identified which imaging facility to use, a protocol that

affected no referral to anyone's knowledge; (2) Providence Medical Group routinely encourages

its physicians to use Health System imaging facilities, but has never taken any adverse action

against any person based on referral patterns; and (3) the Health System has been proceeding

carefully with respect to establishing electronic links with outside entities, to protect its computer

system and its technology, but in late 2005 offered two types of links to EPIC which are being

implemented.

The parties dispute the implications of these facts.  Defendants contend that plaintiffs

cannot show that defendants' conduct was predatory or anticompetitive in nature. Defendants

argue that the conduct has been recognized as legitimate and procompetitive in nature.

Plaintiffs object to Providence's encouragement of the Providence Medical Group and its

other providers to refer diagnostic imaging to Providence hospitals, CMI, and PMI. Defendants

note that maximizing referrals to panel members is pro-competitive because it is a selling point

that allows the panel to negotiate reduced rates. Defendants characterize the conduct as a routine

effort to cross-sell within an entity, an act that is considered legitimate competitive behavior.

They claim that Providence's refusal to allow electronic access between plaintiffs' and

Providence's facilities is part and parcel of encouraging referrals to Providence's affiliated

providers and discouraging referrals out-of-network. Providence notes that the electronic link

plaintiffs seek is not installed to non-Providence hospitals either.

An insurer's requirement that doctors refer to other participating doctors unless the

patient is notified of a referral outside the plan, along with reduced benefits paid to

nonparticipating doctors, tended to foreclose nonparticipating doctors from doing business with

the plan's patients. The court held that the requirement did not cause an impermissible market

distortion in Barry v. Blue Cross of California, 805 F.2d 866, 872 (9th Cir. 1986) (unlawful

restraint of trade claim), and thus did not have a prohibited anticompetitive effect.

Plaintiffs object to the opening of CMI and PMI. Defendants contend that vertically

integrating into an adjacent market is not an antitrust violation, even if it displaces an existing

supplier in the process. Particularly in the delivery of health care, defendants contend that

integration is widely recognized as a means of improving quality and increasing efficiency.

Defendants contend that from the perspective of the diagnostic imaging market as a whole, the

opening of new outpatient facilities increased consumer choice and enhanced competition.

From the consumer's viewpoint, the opening of CMI and PMI added two new sources for diagnostic imaging. Viewed alone, that is procompetitive. But plaintiffs also object to the termination of the provider contracts with plaintiffs' radiologists. Defendants note that the essence of a preferred provider organization is to contract with a limited group of providers and keep referrals within the system, thus allowing the negotiation of lower prices with the providers in return for channeling greater volumes of business to them. Defendants contend that courts and federal antitrust enforcement agencies recognize preferred provider organizations as procompetitive and pro-consumer. See Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc., 123 F.3d 301 (5th Cir. 1997) (no restraint of trade when one provider hospital was replaced by another on a preferred provider panel; preferred provider organizations can lower the cost of medical care by allowing negotiation of lower prices; rule of reason analysis focuses on whether the exclusion reduced competition by making the excluded provider unable to compete).

Plaintiffs characterize defendant's provider contracts as exclusive dealing contracts which are an unreasonable restraint of trade, and thus anticompetitive. Plaintiffs argue that the approved provider list is the vehicle defendants used to terminate plaintiffs as an upstream method of controlling access to physician referrals. Plaintiffs contend that the joint venture agreements with CMI and PMI are downstream horizontal contracts that unquestionably give exclusive rights to provide outpatient diagnostic imaging services to the partners. According to plaintiffs, the question is the extent of foreclosure, rather than whether a contract is absolutely exclusive. Because of the size of defendants in the local health care market, plaintiffs argue that defendants' aggressive plan of vertical integration to increase market share in all divisions is

anticompetitive.

Plaintiffs argue that participants and enrollees are effectively restricted from going out-of-network under the Health Plan and PPO because of the financial penalties to do so. Plaintiffs also discount defendants' argument that employers, insurance companies, and other payors can always add plaintiffs or other providers to their panels. Case law supports defendants' position on both of these points, however. See Doctor's Hospital, 123 F.3d at 311 (when the preferred provider organization SMA replaced hospital DHJ, "[n]ot only can SMA subscribers still use DHJ at higher prices if they desire, but, critically, the purchasers of health care plans, who select among managed care alternatives, are free to choose one of the six PPOs with which DHJ was still affiliated").

Plaintiffs contend that the decision to terminate them from the approved provider list must be analyzed along with the collective effect of defendants' foreclosure through exclusive agreements excluding competition for physician referrals and funneling them to CMI and PMI, the noncompetition agreements between Providence and the CMI and PMI partners, defendants' ability to steer patients through its insurance products, defendants' restrictive Health Plan and PPO terms prohibiting employers and other payors from contracting with plaintiffs directly, and bundled pricing that further insulates referring physicians, patients, and payors from monopoly pricing.

Plaintiffs are correct that the court is not to dissect defendants' conduct too minutely:

[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect. At the same time, if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing. Similarly, a finding of some slight wrongdoing in certain areas need not by itself add up to a violation. We are not

dealing with a mathematical equation.  We are dealing with what has been called
the synergistic effect of the mixture of the elements.

<u>City of Anaheim v. Southern California Edison Co.</u>, 955 F.2d 1373, 1376 (9th Cir. 1992).

The case law is more supportive of defendants' position than plaintiffs', although many

of the preferred provider organization cases analyze restraint of trade claims under the rule of

reason rather than attempted monopoly claims.  Dr. Whitelaw notes the evidence of higher

quality services available at plaintiffs' facilities and the concern of some of the interviewed

physicians.  He also notes the lack of price transparency for medical services, making it difficult

for consumers to price-shop between providers.  Second Whitelaw Decl. ¶¶ 62-65.  The market is

not as straightforward as many consumer markets.

Based on Dr. Whitelaw's concerns, along with the factual issue of how many patients

would be financially foreclosed from receiving services at plaintiffs' facilities, I conclude that a

reasonable jury could find that defendants engaged in anticompetitive conduct.

      B.    <u>Specific Intent to Monopolize</u>

Defendants contend there is neither evidence to support an inference of specific intent to

monopolize nor actual evidence of such intent.  Defendants point to the CMI and PMI business

plans which they claim demonstrate an intent to compete on the merits, based on service and

quality, and a hope for modest success in the market.

Plaintiffs contend that defendants' detailed strategic plans demonstrate a specific intent to

monopolize.  Plaintiffs note the plans' expectation to leverage the combination of defendants'

health care providers with the Health Plan and PPO insurance payor, the goal of attracting a large

percentage of new physicians in the area to an affiliation with Providence, and the plan's use of

defendants' foundation to grow market share.  Plaintiffs also rely on defendants' profitability in 2004 and note the plans for building or acquiring additional facilities as well as a major independent health insurance company.

"Anticompetitive conduct alone can satisfy the specific intent requirement if the conduct form[s] the basis for a substantial claim of restraint of trade or is clearly threatening to competition or clearly exclusionary."  Weyerhaeuser, 411 F.3d at 1042 (internal quotations omitted).

Defendants long-range financial and strategic plans raise a factual issue of whether they intended to monopolize.

C.      Dangerous Probability of Achieving Monopoly Power

Monopoly power is the "power to control prices or exclude competition."  Weyerhaeuser, 411 F.3d at 1043 (internal quotation omitted).  To analyze whether there is a dangerous probability of monopolization, the court considers "the relevant market and the defendant's ability to lessen or destroy competition in that market."  Id. (internal quotation omitted).  To control prices, a monopolist needs market power.  Id.

"To demonstrate market power circumstantially, a plaintiff must:  (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run."  Rebel, 51 F.3d at 1434.

> [T]he minimum showing of market share required in an attempt case is a lower
> quantum than the minimum showing required in an actual monopolization case.  It
> is true, as the district court stated, that numerous cases hold that a market share of
> less than 50 percent is presumptively insufficient to establish market power.
> However, these cases and others cited by the actual district court involve claims of

*actual* monopolization.  When the claim involves attempted monopolization, most cases hold that a market share of 30 percent is presumptively insufficient to establish the power to control price.

. . . Courts should be wary of the numbers game of market percentage when considering attempt-to-monopolize claims. . . . The far wiser approach . . . [is to] carefully analyz[e] certain telltale factors in the relevant market:  market share, entry barriers and the capacity of existing competitors to expand output.

Id. at 1438 & n.10 (internal quotation and citation omitted).

Dr. Whitelaw calculates Providence's resulting market share to be 40.3% for CT, 36.9% for mammogram, 33.3% for MRI, and 43.0% for nuclear imaging.  Second Whitelaw Decl. ¶ 43. Defendants characterize these market shares as presumptively unlikely to support an attempted monopolization claim absent market conditions not present here.  Because the shares are all above the 30% threshold used in attempted monopoly cases, we must turn to a review of the entry barriers.

Entry barriers are additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants, or factors in the market that deter entry while permitting incumbent firms to earn monopoly returns.  The main sources of entry barriers are:  (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale.  In evaluating entry barriers, we focus on their ability to constrain not those already in the market but . . . those who would enter but are prevented from doing so.

To justify a finding that a defendant has the power to control prices, entry barriers must be significant – they must be capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting.  Barriers to entry are insignificant when natural market forces will likely cure the problem.  In such cases, judicial intervention into the market is unwarranted.

Id. at 1439 (internal quotation and footnote omitted).

"The fact that entry has occurred does not necessarily preclude the existence of

Page 24 - OPINION AND ORDER

'significant' entry barriers.  If the output or capacity of the new entrant is insufficient to take

significant business away from the predator, they are unlikely to represent a challenge to the

predator's market power."  Id. at 1440.

Plaintiffs note that barriers to entry exist, including that a radiology group must employ or

be operated by a licensed radiologist, that the initial investment cost is extremely high due to the

capital costs of the imaging equipment, and that plaintiffs have a reputation of an innovative

highest-quality provider.  Plaintiffs contend that a new entrant must have enough physician

referrals to provide sufficient economies of scale to compete with larger, more entrenched

competitors such as defendants.  According to plaintiffs, defendants' ability to exclude imaging

providers from the Health Plan and PPO, combined with the ability to funnel patients by

controlling the referring physician, makes the market impenetrable by new entrants unless

Providence consents.

Defendants do not believe that any entry barriers exist and point to the number of new

imaging centers that have entered the market.

The record contains the following evidence.

A 2004 draft of Providence's Ambulatory Services Strategy states:  "The market

dynamics of the three major delivery systems, each aligned with a health insurance plan

(Providence-PHP, Legacy-Regence and Kaiser) have made it difficult for others to successfully

enter the area."  Kelley Aff. Ex. 6 at 30.  I note the reference is to the entire Health System and

not the diagnostic imaging markets at issue here.  More specific to those markets, Dr. Whitelaw

quoted a portion of the Providence Health System in Oregon and Radiology Specialists of the

Northwest, PC Joint Venture, Business Plan dated October 21, 2003:

> "This proposal [for an east-side JV] expands the capability of the Providence Health System and the Radiology Specialists of the Northwest to serve those who would otherwise make the choice to obtain these services from competitors. It provides a barrier in the market for new competitors . . . ." (page 5)

> "National Proprietary imaging centers will view this imaging center as a barrier to their own entrance into the market." (page 6).

Whitelaw Report at 19 (footnotes excluded).

Defendants list 25 providers contracted with PHP to offer the types of diagnostic imaging at issue here. Second Jackson Decl. ¶ 31. I note that some of them, for example Southwest Washington Medical Center, are not in the geographic market which I concluded a jury could limit to the tri-county area. Dr. Whitelaw analyzed data from 16 providers. Whitelaw Report at 15. There is no evidence, however, on when these providers entered the market. They may have been in operation for years, thus providing no information on current entry barriers.

Plaintiffs both made a profit in 2004. Warnock Dep. at 15-16; Meunier Dep. at 136. I see little relevance to the issue of entry barriers. Current competitors could all be making money but an entry barrier could completely preclude new entrants. See Los Angeles Land Co. v. Brunswick Corp., 6 F.3d 1422, 1428 (9th Cir. 1993) (plaintiff chose not to allege that Brunswick monopolized the bowling equipment market under a supply monopoly theory by refusing to provide equipment for a new bowling center), cert. denied, 510 U.S. 1197 (1994).

Dr. Meunier, of Body Imaging, believes that there is a moderate degree of difficulty in entering the market because of the number of imaging centers that currently exist. To start his business, he had to find a location of 11,000-12,000 square feet, sign a lease for ten years, lease $3.75 million in diagnostic imaging equipment, furnish the office, and hire a staff with a monthly payroll of $95,000. Meunier Dep. at 85-87. He believes the biggest impediments to entry are the

high capital cost of the equipment, the current shortage of radiologists, and the growing

dominance of Providence in the market.  Dr. Warnock, of EPIC, considers those same entry

barriers to be significant in the imaging modalities at issue here.

Competitor Open MRI opened in 1995.  Adventist Medical Center recently opened an

outpatient imaging center in Gresham.  The Legacy system recently opened an outpatient imaging

center adjacent to Meridian Park Hospital.  Tuality Hospital recently opened an outpatient

services center for diagnostic imaging adjacent to its hospital.  Meunier Dep. at 90, 93, 94.  There

is no information on whether their capacity is sufficient to take market share away from

defendants.

Dr. Siker, who had previously worked for Body Imaging, opened Siker Medical Imaging

in May 2005.  The business invested in an MRI and has not been profitable in the six months

between opening and December 2005, even though it is credentialed by all commercial health

insurance carriers with the exception of defendants.  If Dr. Siker did not have a successful

clinical practice as a neuroendovascular surgeon, he would not have opened an imaging center

because of the substantial capital costs, Providence's large market share, and Providence's

exclusion of other imaging centers from its Health Plan and PPO.

Some of the issues raised by plaintiffs do not represent items which are a greater

disadvantage for new entrants than for incumbents.  For example, there is no evidence that the

capital cost of the imaging equipment is greater for new entrants than for incumbents who must

stay current with the technology.  See Los Angeles Land Co., 6 F.3d at 1428 ("'The mere fact

that entry requires a large absolute expenditure of funds does not constitute a 'barrier to entry'; a

new entrant is disadvantaged only to the extent that he must pay more to attract those funds than

would an established firm.'" (quoting 2 Areeda & Turner, Antitrust Law ¶ 409e at 303)).  There is also a lack of evidence on how the cost of equipping an office compares to the ability to fund the expense or the likely returns once the office is open.  See Morgan, Strand, 924 F.3d at 1490 ("Because the evidence does not permit comparing that cost [equipping an office] to potential competitors' resources or expected returns, a jury could not reasonably have found that barrier significant.").

The shortage of radiologists would affect new entrants more significantly.  There is no evidence that the shortage has always existed.  There is also no evidence on how the shortage would affect an existing competitor's ability to increase capacity.  Their current radiologists could only perform some number of additional procedures without hiring more radiologists.

The last factor is defendants' ability to keep new entrants off its PPO panel and Health Plan.  Again, this would not affect new entrants differently than current competitors, as demonstrated by plaintiffs here.

The record thus far shows entry barriers of a shortage of radiologists.  Although this could be significant, there is also evidence of several new entrants, including PMI and CMI plus those listed by Dr. Meunier.

> Market power cannot be inferred solely from the existence of entry barriers and a dominant market share.  The ability to control output and prices – the essence of market power – depends largely on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant.  Competitors may not be able to increase output if there are barriers to expansion.  One such barrier is lack of excess capacity.  Excess capacity is the capacity of the rivals in a market to produce more than the market demands at a competitive price.

Rebel, 51 F.3d at 1441 (internal citation omitted).

Page 28 - OPINION AND ORDER

There is no evidence on the issue of capacity.

The underlying issue is whether defendants have the power to control prices so that they can start charging supracompetitive prices.  For plaintiffs to prevail by demonstrating market power circumstantially, they must show that there are significant barriers to entry and that existing competitors lack the capacity to increase their output in the short run.  Id. at 1434.  If defendants began charging supracompetitive prices but did not have enough power to control prices, the market would correct itself by either attracting new competitors who would charge competitive prices, or by causing existing competitors to increase their capacity and still charge competitive prices.

Plaintiffs failed to demonstrate that existing competitors cannot increase their capacity. There is no evidence on the issue.  Thus, it is possible that the market could self-correct with an increase in capacity by existing competitors.  Plaintiffs have only provided evidence on the entry barrier of a shortage of radiologists.  That evidence, however, is limited to a simple statement that a shortage exists.  It is not quantified in any way.  There is no way for a jury to determine the severity of the shortage or how it would affect a potential competitor.  I must conclude that plaintiffs have failed to create a factual issue that there are significant entry barriers.  With the failure to meet these burdens, in light of the market shares calculated by Dr. Whitelaw, I conclude that plaintiffs have not demonstrated that a factual issue exists on whether there is a dangerous probability of achieving monopoly power.

D.    Causal Antitrust Injury

Defendants note that plaintiffs's request to be restored to the PPO panel by court order is a request to join what plaintiffs contend is an unlawful conspiracy.  Thus, defendants argue that

plaintiffs do not assert an antitrust injury. Defendants also contend that losing business to new market entrants CMI and PMI is not antitrust injury. They cite cases for the proposition that the substitution of one supplier for another does not give rise to antitrust injury because it does not represent an injury to competition.

Plaintiffs argue that defendants' attempted monopoly will significantly harm patients and competition by giving patients less choice, steering patients from the highest quality providers and thus increasing the risk of overall lower quality of services, delaying the entry of new technology into the market, and allowing defendants to command supra-competitive prices because of the price insensitivity of referring physicians, patients, and payors.

> To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition. If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se.

Rebel, 51 F.3d at 1433 (internal quotation omitted).

"One form of antitrust injury is coercive activity that prevents its victims from making free choices between market alternatives." Glen Holly Entertainment, Inc. v. Tektronix, Inc., 352 F.3d 367, 374 (9th Cir. 2003) (alleged collusive agreement between the only two competitors to remove one product from the market is sufficient to support antitrust claim).

Dr. Meunier is concerned that the 20% loss of volume representing patients covered by Providence-controlled health plans, plus additional losses resulting from increased administrative burdens for intake and administrative staff at referring physician offices, will push Body Imaging and Women's Imaging below breakeven financial performance within the next year.

Dr. Warnock believes that a number of imaging providers in the Portland area will not survive the next three years if Providence continues on its growth track and to exclude its imaging competition from its insurance network. He thinks that EPIC will suffer a substantial reduction in the scope of its business, resulting in less capability to bring advanced technology to the Portland market. Further, Dr. Warnock believes that Portlanders will be paying more on average for most imaging procedures than would have been the case in a truly competitive market.

A "simple loss of business or even the demise of a competitor" is not an antitrust injury that will support a claim. The injury must be an "impairment of the competitive structure of the market." The Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island, 373 F.3d 57, 66 (1st Cir. 2004) (if exclusive dealing contract was likely to lead to a shortage of competitors, and new entry was difficult, the few remaining competitors might be able to conspire without being disciplined by competition, leading to antitrust injury). "[E]xclusion may present competitive concerns if providers are unable to compete effectively without access to the network, and competition is thereby harmed." Doctor's Hospital, 123 F.3d at 309.

Plaintiffs have evidence that they are considered high quality, innovative competitors, and that defendants' exclusion of them may lead to the demise of one and the reduced ability to innovate by the other. Although Health Plan and PPO patients may pay out-of-network charges to continue to use plaintiffs' services, or may change insurers, their choices are foreclosed to some extent. This is adequate to raise a factual issue on whether there is causal antitrust injury.

E.    Summary

Because plaintiffs failed to raise a jury question about whether there is a dangerous

probability of achieving monopoly power, I grant summary judgment against their attempted monopoly claim.

## CONCLUSION

Defendants' Motion to Exclude Plaintiffs' Expert Testimony (#182) is denied.

Defendants' Motion for Summary Judgment (#168) is granted.  This action is dismissed with prejudice.

IT IS SO ORDERED.

DATED this 21st day of March, 2006.


/s/ GARR M. KING
GARR M. KING
United States District Judge